# **Exhibit A**

ASSET PURCHASE AGREEMENT

by and between

**ORCO Construction Supply, Inc.
a California corporation**

**AND**

**HD Supply Construction Supply, Ltd.,
a Florida limited partnership (dba WhiteCap)**

Dated as of May __, 2009

ATLANTA:5126391.1

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement") is dated as of May __, 2009 and entered into by and between ORCO Construction Supply, Inc., a California corporation (the "Seller"), and HD Supply Construction Supply, Ltd., a Florida limited partnership (dba WhiteCap) (the "Purchaser").

## RECITALS:

**WHEREAS**, the Seller is in the business of distributing professional construction supply products in the western United States (the "Business");

**WHEREAS**, the Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code ("Bankruptcy Code"), in the matter of In Re ORCO Construction Supply, Inc., Debtor, Case No. 09-42847-T (the "Bankruptcy Case"), in the United States Bankruptcy Court, Northern District of California ("Court"), on April 7, 2009, and is operating the Business as debtor-in-possession under the Bankruptcy Code. As such, the Seller is executing this Agreement, and documents related thereto, subject to Court approval of this Agreement in the Bankruptcy Case;

**WHEREAS**, effective on the date of the Closing (as hereinafter defined) and subject to and conditioned upon the Court's approval, the Seller desires to sell or assign to the Purchaser, and the Purchaser desires to acquire or assume from the Seller, certain assets of the Seller as described in Section 1.1 (the "Purchased Assets") and certain of the executory Contracts and unexpired Leases of the Seller as described in Section 1.2 (the "Executory Contracts and Unexpired Leases"), all subject to the terms and conditions hereinafter set forth;

**WHEREAS**, this Agreement and the sale of the Purchased Assets and the Executory Contracts and Unexpired Leases to the Purchaser are subject to Court approval in the Bankruptcy Case at a sale hearing (the "Sale Hearing"); and

**WHEREAS**, for the convenience of the parties, the definitions of certain terms used in this Agreement are set forth in Section 9.12.

## AGREEMENT:

**NOW, THEREFORE**, in consideration of the foregoing premises, the representations, warranties, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS

1.1     Purchased Assets to be Transferred.  Subject to the terms and conditions of this Agreement, at the Closing, the Seller shall sell, transfer, convey, assign and deliver to the Purchaser, and the Purchaser shall purchase and accept from the Seller, all of the assets and Executory Contracts and Unexpired Leases (other than the Excluded Assets pursuant to

ATLANTA:5126391.1

Section 1.3 and any Contracts previously rejected pursuant to Section 1.2(a)) utilized by Seller in or relating to the Business, including all of the Seller's right, title and interest in, to and under any and all physical and/or technology-based assets, properties and rights of the Seller of every kind, nature and description, real, personal or mixed, tangible or intangible, known or unknown, wherever located, and any other assets related, either directly or indirectly, to the Business, as the same shall exist on the Closing Date, free and clear of any Encumbrances, Claims, and interests (to the full extent permitted by the Bankruptcy Code, as determined by the Court in the Sale Order), unless otherwise expressly specified herein. The Seller expressly agrees that the sale of the Purchased Assets constitutes a transfer of all of the Seller's rights with respect to the Purchased Assets. Without limiting the generality of the foregoing, the Purchased Assets include all of the Seller's right, title and interest in, to or under the following (but excluding the Excluded Assets):

(a)     all Tangible Personal Property of the Seller, other than Excluded Personal Property (as defined on <u>Schedule 1.3(l)</u>);

(b)     all Accounts Receivable and other debts owing to the Seller on the Closing Date, all prepaid expenses in the Seller's possession, advances and deposits in the Seller's possession, all payments in transit to the Seller, and all refunds or rebates that may now or hereafter be determined to be owed to the Seller;

(c)     all Intellectual Property, to the extent transferable by Seller under the Bankruptcy Code, as determined by the Court in the Sale Order;

(d)     all Governmental Authorizations and all pending applications therefor or renewals thereof, in each case to the extent transferable by the Seller under the Bankruptcy Code, as determined by the Court in the Sale Order, including without limitation those listed on <u>Schedule 1.1(d)</u>;

(e)     all Inventories, other than Excluded Inventories (as defined on <u>Schedule 1.3(l)</u>);

(f)     all rights to income, royalties, damages and payments due at or after Closing, and all other rights with respect to such rights to income, royalties, damages and payments (including, without limitation, rights to damages and payments for past, present or future infringements or misappropriations of any Intellectual Property), except as to any claims of the Seller as bankruptcy trustee pursuant to Chapter 5 of the Bankruptcy Code;

(g)     all causes of action, demands, judgments, claims (including insurance claims), indemnity rights (to the extent assignable to Purchaser) or other similar rights of the Seller relating to the Purchased Assets or arising under express or implied warranties from suppliers or other third parties with respect to any Purchased Assets, except as to all claims of the Seller as bankruptcy trustee pursuant to Chapter 5 of the Bankruptcy Code;

(h)     all books and records of the Seller relating to any Purchased Assets, including, without limitation, correspondence, production records, accounting records, Tax records with respect to the Purchased Assets, financial records, property records, mailing lists, customer and vendor lists, and Intellectual Property files, provided that, to aid in the

2

administration of the Bankruptcy Case, Seller may obtain at its own expense copies of any such books and records transferred to Purchaser, or may make copies of any or all such books and records before their transfer to Purchaser;

(i)        all interest in and to all telephone, telex and telephone facsimile numbers, domain names and websites listed on <u>Schedule 1.1(i)</u>, and any other directory listings;

(j)        the unfulfilled portion of any purchase orders entered into by customers of the Seller and the Seller prior to the Closing, including without limitation any purchase orders listed on <u>Schedule 1.2</u>;

(k)        the items (the "<u>Other Assets</u>"), if any, listed in <u>Schedule 1.1(k)</u> hereto (although this shall not be deemed to constitute an exhaustive list of Other Assets).

1.2        <u>Assumption of Executory Contracts and Unexpired Leases.</u>  Subject to the terms and conditions of this Agreement and on the basis of the agreements contained herein, and subject to approval of the Court, the following procedures shall apply:

(a)        Attached hereto is <u>Schedule 1.2</u>, which identifies those of the Executory Contracts and Unexpired Leases of the Seller that the Purchaser wishes the Court, at the hearing on the Sale Motion, to authorize the Seller at the Closing to assume and assign to the Purchaser, and any conditions to the Purchaser's willingness to have such Executory Contracts and Unexpired Leases assumed by the Seller and assigned to the Purchaser.  The Seller shall have the right, but not the obligation, to reject any executory contract or unexpired lease at any time if, at that time, such contract or lease is not designated by the Purchaser for assumption and assignment on <u>Schedule 1.2</u>; provided, however, that the Seller shall not be permitted to reject any Executory Contract or Unexpired Lease that is necessary for the access to be provided to the Purchaser pursuant to Section 6.5; provided further that the Seller shall use its best efforts to obtain an order rejecting any such agreement immediately after the Purchaser's written notice to the Seller requesting same.

(b)        On April 29, 2009, the Seller submitted to the Court a list of all of the Debtor's Executory Contracts and Unexpired Leases, and all amendments and supplements thereto (the "<u>Master Contract and Lease List</u>"), together with its proposed calculation of pre-petition arrearages and per diem rates as reflected in its books and records ("<u>Proposed Cure Amounts</u>").  Pursuant to the Order Approving Motion Of Debtor In Possession To Establish Sale Procedures And Scheduling Hearing On Motion For Sale Of Substantially All Its Assets issued by the Court on May 11, 2009 (the "<u>Sale Procedures Order</u>"), the counter-parties to the Seller's Executory Contracts and Unexpired Leases had until May 6, 2009 to provide notice to the Court of any disagreement with the proposed Master Contract and Lease List and/or Proposed Cure Amounts.  If no objection to the Proposed Cure Amounts were timely filed, such Proposed Cure Amounts became binding upon the non-debtor parties to such Executory Contracts and Unexpired Leases as the actual cure amounts (the "<u>Cure Amounts</u>") and such non-debtor parties were deemed to have waived any assertion that, upon payment of such Proposed Cure Amount, such Executory Contract or Unexpired Lease will be in full force and effect.  If an objection was filed to any Proposed Cure Amount, then a hearing shall be set, as provided in the Sale Procedures Order, for determination of such Cure Amount.  If the Court determines that a Cure

Amount greater than the Proposed Cure Amount scheduled by the Seller is due, then the Purchaser may remove such Executory Contract or Unexpired Lease from the designated list to be assumed and assigned by notice filed with the Court and served on the Seller and the non-Debtor parties to such contract or lease within 10 days after the Court's determination of the Cure Amount.  If the Court does not determine a Cure Amount or any other disputed issues regarding an Executory Contract or Unexpired Lease prior to the Sale Hearing, then the Purchaser may elect either (i) to remove such Executory Contract or Unexpired Lease from the Purchaser's designation of Executory Contracts and Unexpired Leases to be assumed and assigned, or (ii) to request that the Court continue the hearing as to such Executory Contract or Unexpired Lease (while proceeding with the Sale Hearing in all other respects), and to determine at the continued hearing the Cure Amount and any other disputed issues, and thereafter permit the Purchaser to elect whether (x) to pay the Cure Amount once determined by the court, and direct the Seller to proceed with assumption and assignment, or (y) not to pay that amount and, if the Purchaser desires, direct the Seller to reject such Executory Contract or Unexpired Lease pursuant to the procedures set forth in the Sale Procedures Order and the Sale Order.  In the event that the Purchaser elects the procedure in clause (ii) above, then the Purchaser shall pay to Seller on a current basis any post-petition administrative expense relating to such Executory Contract or Unexpired Lease pending the determination whether it will be assumed and assigned or rejected.

(c)    If the Purchaser is the winning bidder after conclusion of the Sale Hearing, then the Purchaser may direct that any Executory Contract or Unexpired Lease not listed in Schedule 1.2 and not previously rejected shall be rejected, pursuant to the procedures set forth in the Sale Procedures Order and the Sale Order, and subject to Section 6.5.

(d)    It is acknowledged that Purchaser may condition assuming any particular real property lease on its completion of environmental due diligence concerning the relevant property, obtaining appropriate environmental indemnities from the relevant landlord and the removal of any Hazardous Materials from the relevant premises.

(e)    Purchaser may, at any time prior to the final hearing on the Sale Motion, amend its designation on Schedule 1.2 to add (if not previously rejected) or remove any Executory Contracts and Unexpired Leases, provided that adequate notice (as determined by the Court) is given promptly to the non-debtor parties to such Executory Contracts and Unexpired Leases.

(f)    At the Closing, if the Purchaser has been confirmed as the winning bidder by the Court at the Sale Hearing, the Seller shall assume and assign and the Purchaser shall accept the assignment of and assume sole responsibility for future performance of obligations arising after the Closing under those Executory Contracts and Unexpired Leases that the Court has authorized the Seller to assume and assign to the Purchaser, and the Purchaser shall have sole responsibility for paying all Cure Amounts, if any, with respect to such Executory Contracts and Unexpired Leases.  Purchaser shall indemnify the Seller against any liability for any Cure Amounts in relation to the Executory Contracts and Unexpired Leases that the Purchaser designated to be assumed and assigned to it.

4

   1.3  <u>Excluded Assets.</u> Notwithstanding the provisions of Section 1.1 above, the Purchased Assets do not include, and the Seller will not transfer to the Purchaser any of the following assets (hereinafter the "<u>Excluded Assets</u>"):

     (a)  all cash, bank deposits, securities and cash equivalents, including for this purpose, all cash and cash equivalents if credited to the Seller's bank accounts prior to the Closing Date;

     (b)  any Contract or Lease other than the Executory Contracts and Unexpired Leases assumed as provided in Section 1.2 above;

     (c)  the consideration delivered to the Seller by the Purchaser pursuant to this Agreement and all rights of the Seller under this Agreement and any ancillary documents or agreements (the "<u>Ancillary Agreements</u>") provided under Section 6.6 below (Further Assurances);

     (d)  the employee benefit agreements, plans or arrangements of the Seller and any assets thereof;

     (e)  all corporate minute books, stock transfer ledgers and corporate seals of the Seller;

     (f)  except as provided in Section 1.1(h) above, the Seller's income Tax and franchise Tax Returns and Tax records (provided that copies of such Tax Returns and Tax records shall be provided to the Purchaser);

     (g)  any books, records or other information related solely and exclusively to the Excluded Assets, subject to Section 1.1(h) above;

     (h)  all refunds, credits or deposits of Taxes with respect to the period prior to the Closing Date, including without limitation any refunds, credits or deposits of Taxes arising as a result of the Seller's operation of the Business or ownership, operation, utilization or maintenance of the Purchased Assets prior to the Closing Date (other than with respect to personal property taxes assumed by the Purchaser pursuant to Section 1.4);

     (i)  all claims pursuant to Chapter 5 of the Bankruptcy Code;

     (j)  all Hazardous Materials not specifically identified by the Purchaser as Inventory;

     (k)  any assets that in the Seller's sole discretion it may have elected to sell, or commit to sell, or abandon, at any time, prior to the time, if any, the Purchaser becomes the winning bidder at the auction, subject to Section 1.7(e) (Purchase Price Adjustments) and Section 7.1(h) (termination if Seller takes certain actions); and

     (l)  the items listed on <u>Schedule 1.3(l)</u> hereto. Purchaser shall have the right, in its sole discretion, to amend <u>Schedule 1.3(l)</u> at any time up until the Closing in order to exclude additional items from the scope of Purchased Assets; provided, however, that the

5

inclusion of any additional items on Schedule 1.3(l) will not have any effect on the calculation of the Working Capital Adjustment (which will be calculated pursuant to Section 1.7 below, including Annex I hereto).

1.4     Assumed Liabilities.   Upon the terms and subject to the conditions set forth herein, including without limitation the terms of the Sale Order, at the Closing, the Purchaser shall assume (a) all executory Liabilities (and any Cure Amounts, if any) with respect to the Executory Contracts and Unexpired Leases assumed by the Purchaser pursuant to Section 1.2 hereof, (b) all Liabilities (including without limitation for any Tax) that arise on or after the Closing Date solely with respect to the Purchaser's ownership or operation of the Purchased Assets after the Closing (but excluding all Liabilities—including without limitation for any Tax—that relate to Seller's ownership or operation of the Purchased Assets prior to the Closing, and (c) such other liabilities of the Seller as described on Schedule 1.4 (collectively "Assumed Liabilities"). The parties further agree that any Taxes included among the Assumed Liabilities and any charges for water, gas, power, light, and other utility service included among the Assumed Liabilities shall be prorated between the Seller and the Purchaser, such that regardless of when or by whom actually paid or payable, the Seller shall bear any of such Taxes and charges levied, assessed or payable for or with respect to any period before the Closing Date and Purchaser shall bear any of such Taxes and charges levied, assessed or payable for or with respect to any period on or after the Closing Date.

1.5     Excluded Liabilities.   The Purchaser, by its execution, delivery and performance of this Agreement, any Ancillary Agreement or otherwise, shall not assume or otherwise be responsible for any Liability or obligation of any nature, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, whether due or to become due, other than the Assumed Liabilities (collectively the "Excluded Liabilities").

1.6     Closing Consideration.   The aggregate consideration for the sale and transfer of the Purchased Assets shall be (a) Fourteen Million Dollars ($14,000,000) (the "Base Amount"), plus or minus the amount of Working Capital Adjustment as determined as of the date of the Sale Order, plus an additional Three Million Dollars ($3,000,000), which price is payable by the Purchaser in cash at the Closing (to the extent not previously paid as the Deposit), and (b) the assumption by the Purchaser of the Assumed Liabilities (collectively, the "Closing Consideration"). The amount of cash portion of the Closing Consideration is referred to herein as the "Purchase Price". Within one(1) business day following the entry of the Sale Order, the Purchaser shall wire Sixteen Million Seven Hundred Twenty Thousand Dollars ($16,720,000, being the Base Amount of $17,000,000 less the $280,000 Deposit) to its counsel, McKenna Long & Aldridge LLP, who shall notify the Seller's counsel in writing of McKenna Long & Aldridge LLP's receipt of such funds and shall hold such funds in trust for application pursuant to this Agreement pending further order of the Court.

1.7     Purchase Price Adjustments.

(a)     Working Capital.   For purposes of this Agreement, "Working Capital" shall be an amount equal to eighty percent (80%) of the Seller's Accounts Receivable and forty percent (40%) of Inventories determined as of the date of the Sale Order and to be computed as set forth in Annex I hereto.

(b)    Working Capital Calculation.  During the ten (10) day period following the entry of the Sale Order on the Court's docket (the "Calculation Period"), the Seller and the Purchaser shall in good faith mutually determine the Working Capital of the Seller as of the Sale Order date as provided in Section 1.7(d) below.  At the Closing, the Base Amount will be increased or decreased, as the case may be, on a dollar for dollar basis to the extent that the Working Capital is greater or less than the Fourteen Million Dollars ($14,000,000) (the "Working Capital Adjustment").

(c)    Post Sale Order Changes.  If and to the extent that any Accounts Receivable or Inventories included in the calculation of Working Capital are collected or sold, respectively, by the Seller after the date of the Sale Order and prior to the Closing Date (the "Adjustment Period"), then the Seller will, on the Closing Date, pay over to the Purchaser in cash the proceeds from such collections and sales as part of the Purchased Assets.  Without the consent of the Purchaser, during the Adjustment Period, the Seller must not enter into any settlement, waiver, reduction in payment or obligations or similar arrangement relating to any Accounts Receivable and will not dispose of any Inventory other than in the Ordinary Course of Business.

(d)    Determination of Working Capital.  Seller will provide the Purchaser reasonable access during the Calculation Period to Seller's personnel, properties, books and records to confirm the Accounts Receivable and Inventory.  Within one (1) business day after the Seller has received the Sale Order, Seller will deliver to Purchaser a statement, including all financial information and records necessary to determine the same, setting forth, in reasonable detail, the Seller's determination of the Accounts Receivable as of the date of the Sale Order according to GAAP, based upon the Seller's historical accounting practices consistently applied; provided that if the Seller's historical practices are not in accordance with GAAP, then GAAP shall control the determination (the "Statement").  The Statement will be final and binding for purposes of determining the Working Capital, except to the extent that the Purchaser provides written notice to the Seller, not later than four (4) business days after the Purchaser's receipt of the Statement, of the Purchaser's reasonable dispute of any portion of the calculation of Accounts Receivable (and any portion of the Accounts Receivable not disputed by Purchaser shall be deemed final and binding).  Both Seller and Purchaser mutually agree to promptly resolve any disputed Accounts Receivable post-Closing.  A physical count of Inventory will be conducted jointly by the Purchaser and Seller during the Calculation Period and will be used in the determination of Working Capital.

1.8    Deposit. The Purchaser has represented, and the Seller is not aware of any basis to dispute, that the Purchaser has deposited with SunTrust Bank, a Georgia banking corporation, and pursuant to the terms of an Escrow Agreement agreed to among the parties, the sum equal to Two Hundred Eighty Thousand Dollars ($280,000) (the "Deposit").  The Deposit shall be credited against the Purchase Price at the Closing.  If this Agreement is terminated for any reason, then the Deposit shall be forfeited to Seller or returned to the Purchaser as provided in Section 7.1 (Termination).

1.9    Bankruptcy Matters.

7

(a)    Sale Order.  If the Purchaser is the winning bidder at the auction, the Seller shall reasonably cooperate with the Purchaser to obtain an order or orders from the Court (collectively, the "Sale Order") approving this Agreement, authorizing and approving the transactions contemplated hereby, consistent with the intentions of the parties stated in this Agreement, and providing, among other things, in terms reasonably acceptable to the parties: (A) that the Seller may sell, transfer and assign the Purchased Assets and the Executory Contracts and Unexpired Leases to the Purchaser pursuant to this Agreement and Bankruptcy Code sections 105, 363 and 365, as applicable, and that the Purchased Assets are free and clear of all Encumbrances, Claims and interests to the full extent permitted by the Bankruptcy Code, as determined by the Court in the Sale Order; (B) that any Executory Contract or Unexpired Lease not assigned to the Purchaser shall be rejected at the Purchaser's direction; (C) that the non-Debtor parties to all Executory Contracts and Unexpired Leases are bound by the terms of the Sale Order, including without limitation that upon payment of the Cure Amount all Executory Contracts and Unexpired Leases that are to be assumed and assigned will be in full force and effect, with no amendment or supplement or other agreement except as listed in Schedule 1.2, as provided in Section 1.2 above; (D) that the Purchaser shall not assume any of the Seller's liabilities except as provided in Section 1.4 of this Agreement; and (E) that, provided that the Purchaser provides adequate evidence to support a good faith finding, the Purchaser is a good faith purchaser and is thereby entitled to the protections of section 363(m) of the Bankruptcy Code.

1.10    Conditions Precedent.

(a)    Conditions Precedent to the Obligations of the Purchaser.  In addition to the conditions set forth in Section 5.1, the obligation of the Purchaser to consummate the Contemplated Transactions shall be subject to the satisfaction, or the waiver by the Purchaser, of each of the following conditions precedent:

(i)    **[Intentionally omitted]**

(ii)    Seller Performance.  The Seller shall have performed in all material respects all of its covenants and obligations hereunder required to be performed by it prior to or on the Closing.

(iii)    Maintenance of Purchased Assets.  Except as provided in Section 1.3(k) (disposition of assets), the Purchased Assets will have been maintained by Seller in the same manner and condition as they were on the date of this Agreement, subject only to ordinary wear and tear, the sale of Inventory and the collection of Accounts Receivable in the Ordinary Course of Business.

(iv)    Lack of Increased Cure Obligations Under Executory Contracts and Unexpired Leases.  Except as provided in Section 1.2(a) regarding rejection of Contracts or Leases, the Seller will have also performed all of its post-petition obligations under those of the Executory Contracts and Unexpired Leases that have been designated by the Purchaser on Schedule 1.2 for assumption and assignment to the Purchaser, provided that if Seller does not perform such post-petition obligations, and if as a result of such non-performance the net dollar amount of all cure payments actually made by the

8

Purchaser is increased over and above the dollar amount that such cure payments would have been if the Seller had performed such post-petition obligations, then the Purchase Price shall be reduced by the same dollar amount as such increased cure payments.

(b)    Condition Precedent to the Obligations of the Seller.  In addition to the conditions set forth in Section 5.2, the obligation of the Seller to consummate the Contemplated Transactions shall be subject to the satisfaction, or the waiver by the Seller, of the following condition precedent:

(i)    Purchaser Performance.  The Purchaser shall have performed in all material respects all of its covenants and obligations hereunder required to be performed by it prior to or on the Closing.

(c)    No Other Conditions Precedent.  Except as provided in Article V of this Agreement, or as required by Law or otherwise required by the Court, the conditions precedent set forth immediately above are the only conditions precedent to the consummation of the Contemplated Transactions.

## ARTICLE II
## CLOSING

2.1    Closing.  The closing of the Contemplated Transactions (the "Closing") shall take place at the offices of Howard Rice Nemerovski Canady Falk & Rabkin, a Professional Corporation, in San Francisco, California, on a date within one (1) business day after satisfaction or waiver of all conditions to Closing as set forth in this Agreement, or at such date as is mutually agreed to by the parties hereto.  The date of the Closing is referred to in this Agreement as the "Closing Date."

2.2    Actions at the Closing.  At the Closing:

(a)    The Purchaser shall deliver to the Seller the various certificates, instruments and documents referred to in Section 5.2 below;

(b)    The Seller shall deliver to the Purchaser the various certificates, instruments and documents referred to in Section 5.1 below; and

(c)    The Purchaser shall pay to the Seller the Purchase Price pursuant to the Sale Order.

2.3    Simultaneous Deliveries.  The delivery of the documents required to be delivered at the Closing pursuant to this Agreement shall be deemed to occur simultaneously.  No delivery shall be effective until each party has received or waived receipt of all the documents that this Agreement entitles such party to receive.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

9

The Seller represents and warrants to the Purchaser that the statements contained in this Article III are true and correct as of the date hereof and will be true and correct in all material respects through the Closing Date, and subject to the Seller being a debtor and debtor-in-possession under the Bankruptcy Code and the Seller otherwise being subject to the Bankruptcy Case. The representations and warranties set forth in this Article III do not survive the Closing. The Purchaser acknowledges and agrees that the Purchased Assets are being purchased by it on an "as-is", "where-is" basis.

3.1     <u>Corporate Organization, Standing and Power</u>.  The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California.  The Seller has the corporate power to own its properties and to carry on its business as now being conducted and is duly qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would have a Material Adverse Effect. The Seller has furnished or made available to the Purchaser a true and correct copy of the Articles of Incorporation and bylaws, as amended to date, of the Seller.  The Seller is not in violation of any of the provisions of the Articles of Incorporation or its bylaws, as amended to date.

3.2     <u>Authority; No Violation</u>.  Subject to the Court's approval of the transactions contemplated herein:

(a)     Seller has full corporate power and corporate authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and, subject to receipt of any necessary Court approval in accordance with the Bankruptcy Code, to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly approved and adopted by the Board of Directors of the Seller, and, except for Court approval, no other corporate proceedings or approvals on the part of the Seller are necessary to approve this Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly and validly executed and delivered by the Seller. Assuming due authorization, execution and delivery by the Purchaser, this Agreement constitutes, and each of the Ancillary Agreements to which it is a party will at the Closing constitute, the valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as such enforcement may be limited by (i) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (ii) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b)     Neither the execution and delivery of this Agreement or any of the Ancillary Agreements by the Seller nor the consummation by the Seller of the transactions contemplated hereby or thereby, nor compliance by the Seller with any of the terms or provisions hereof or thereof, will

(i)     violate any provision of the Governing Documents of the Seller or

10

(ii)         assuming that the Court approval is obtained,

(x) violate any law or regulation or any judgment, order, writ, decree or injunction applicable to the Seller or any of its properties or assets,

(y) violate, conflict with, result in a breach of any provision of or the loss of any benefit under, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, result in the termination of or a right of termination or cancellation under, accelerate the performance required by or rights or obligations under, or result in the creation of any lien upon any of the Purchased Assets under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, deed of trust, license, lease, agreement, contract, or other instrument or obligation to which the Seller is a party, or by which it or any of the Purchased Assets or its business activities may be bound or affected (except for such violations, conflicts, breaches, defaults or the loss of benefits which, either individually or in the aggregate, would not be a Material Adverse Effect), or

(z) to the best of the Seller's knowledge, require any Consent that would be required under Section 5.1(c) (Seller's Third-Party Consents) or any Governmental Authorization that would be required under Section 5.1(d) (Seller's Government Authorizations).

3.3     No Defaults.  The Seller is not (i) in violation of any provision of its Governing Documents or (ii) in default or violation of any term, condition or provision of (A) any Order applicable to it, or (B) any material Contract or Governmental Authorization to which the Seller is a party, which in any of the cases set forth in clauses (i) and (ii) above would materially and adversely affect its ability to consummate the Contemplated Transactions.

3.4     Licenses, Permits, etc.  The Seller has all licenses, permits, franchises and authority, whether from a Governmental Body or otherwise, including regulatory approvals, necessary to operate the Business and to own the Purchased Assets and to discharge its obligations under the Executory Contracts and Unexpired Leases.

3.5     No Brokers or Finders.  Except the agreement with M&A Capital, LLC as set forth in Schedule 3.5, the Seller has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of the Seller, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and performance of the Contemplated Transactions.

3.6     Sufficiency and Title to the Purchased Assets.

(a)     The Purchased Assets constitute all of the material property and assets owned, held or primarily used in the conduct of the Business, other than the Excluded Assets.

(b)     Upon consummation of the Contemplated Transactions, the Purchaser will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Encumbrances and Claims to the maximum extent permitted by the Bankruptcy Code, as determined by the Court in the Sale Order, other than Assumed Liabilities.

ATLANTA:5126391.1

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller that the statements contained in this Article IV are true and correct as of the date hereof and will be true and correct in all material respects through the Closing Date. The representations and warranties set forth in this Article IV do not survive the Closing.

4.1    Organization. The Purchaser is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Florida and has all requisite power to own, operate and lease its properties and to carry on its business as now being conducted. The Purchaser has furnished or made available to the Seller a true and correct copy of the Certificate of Limited Partnership, as amended to date, of the Purchaser. The Purchaser is not in violation of any of the provisions of the Purchaser's Certificate of Limited Partnership, as amended to date.

4.2    Authority; Enforceability. The Purchaser, in its capacity as a limited partnership, has all requisite power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to perform its obligations hereunder and thereunder and to consummate the Contemplated Transactions, and all limited partnership action required on the part of the Purchaser for such execution, delivery and performance has been duly and validly taken. Assuming due authorization, execution and delivery by the Seller, this Agreement constitutes, and each of the Ancillary Agreements to which it is a party will at the Closing constitute, legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with their respective terms, except as such enforcement may be limited by (i) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (ii) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.3    No Defaults. The Purchaser is not (i) in violation of any provision of its Governing Documents, or (ii) in default or violation of any term, condition or provision of (A) any Order applicable to the Purchaser or (B) any material Contract or Governmental Authorization to which the Purchaser is a party, which in any of the cases set forth in clauses (i) and (ii) above would materially and adversely affect its ability to consummate the Contemplated Transactions.

4.4    No Conflicts. The execution and delivery by the Purchaser of this Agreement and the Ancillary Agreements to which the Purchaser is a party do not, the performance by the Purchaser of its obligations under this Agreement and the Ancillary Agreements to which the Purchaser is a party and the consummation of the Contemplated Transactions do not and will not:

(a)    conflict with or result in a violation or breach of any of the terms, conditions or provisions of the Governing Documents of the Purchaser; or

12

ATLANTA:5126391.1

(b)     assuming that the Court approval is obtained, conflict with or result in a material violation or breach of any Law or Order applicable to the Purchaser or any of the Purchaser's assets.

4.5     <u>No Brokers or Finders</u>.  Except as would not give rise to any liability to the Seller, the Purchaser has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of the Purchaser, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and the performance of the Contemplated Transactions

4.6     <u>Consents, Approvals and Notifications</u>.  Assuming that the Court approval is obtained, the execution, delivery and performance of this Agreement and the Ancillary Agreements and the operation of the Business by the Purchaser as it is constituted as of the Closing Date by the Purchaser, do not, to the best of the Purchaser's knowledge, require the Consent of, or filing with or notification of, any Governmental Body or any other Person or any Governmental Authorization that would be required under Section 5.2(c) (Purchaser's Third-Party Consents) or Section 5.2(e) (Purchaser's Government Authorizations), except for such Consents and filings, the failure to obtain or make would not reasonably be expected to have a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated hereby.

4.7     <u>Sufficient Funds; Financing</u>.  The Purchaser has sufficient immediately available funds to consummate the Contemplated Transaction, including without limitation the payment of the Purchase Price at the Closing in accordance with the terms of this Agreement.

## ARTICLE V
## CONDITIONS TO CLOSING

The obligations of the parties to effect the Contemplated Transactions are subject to the satisfaction at or prior to the Closing of the following conditions:

5.1     <u>Conditions to Obligations of the Purchaser</u>.

(a)     <u>Representations and Warranties of the Seller</u>.  Each of the representations and warranties of the Seller shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)     <u>Agreements and Covenants</u>.  The Seller shall have performed and complied with each agreement, covenant and obligation required by it pursuant to this Agreement and the Ancillary Agreements to which it is a party to be so performed or complied with by the Seller at or before the Closing.

(c)     <u>Third-Party Consents</u>.  Any and all Consents, if any, that the Seller is required to obtain from third parties (other than Governmental Authorizations contemplated by Section 5.1(d)) relating to this Agreement or the Ancillary Agreements or any of the other

13

transactions contemplated hereby or thereby shall have been obtained. Without limiting Section 3.2(b) (Seller's representation and warranty re no Consents etc.), in the event that any such Consent is required, Seller shall use its best efforts to obtain any such Consents.

      (d)    <u>Government Authorizations</u>. All Governmental Authorizations, if any, that the Seller is required to obtain for the consummation of the Contemplated Transactions shall have occurred or been filed or obtained. Without limiting Section 3.2(b) (Seller's representation and warranty re no Government Authorizations etc.), in the event that any such Authorizations are required, Seller shall use its best efforts to obtain any such Authorizations.

      (e)    <u>Bills of Sale</u>. The Seller shall have executed and delivered a General Assignment and Bill of Sale, in a form reasonably acceptable to the Purchaser and the Seller (the "<u>Bill of Sale</u>"), and such other good and sufficient instrument of conveyance, assignment and transfer as the Purchaser shall reasonably request in order to vest good title to each of the Purchased Assets in the Purchaser.

      (f)    **[Intentionally omitted]**

      (g)    <u>Excluded Assets</u>. Seller must have made arrangements that are reasonably satisfactory to Purchaser for all of the Excluded Assets to be removed by Seller, at Seller's sole expense, from any location subject to any of the Executory Contracts and Unexpired Leases, within two weeks of the entry of the Sale Order.

      (h)    <u>Sale Order</u>. Issuance of the Sale Order by the Court in favor of the Purchaser as the buyer of the Purchased Assets (which Sale Order must conform to the requirements in Section 1.9(a)), and such order having been entered on the Court's docket and not less than eleven (11) days have passed without such order being appealed, stayed, amended or modified.

      (i)    <u>No Actions or Proceedings</u>. No claim asserted in writing, action, suit, investigation or proceeding shall be pending or threatened before any court or governmental agency which presents a substantial risk of the restraint or prohibition of the Contemplated Transactions, other than any objections to the Sale Motion.

    5.2    <u>Conditions to Obligations of the Seller</u>.

      (a)    <u>Representations, Warranties and Agreements of the Purchaser</u>. Each of the representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects on the date hereof and through the Closing Date, as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which need to be true and correct only as of the specified date).

      (b)    <u>Agreements and Covenants</u>. The Purchaser shall have performed and complied in all material respects with each agreement, covenant and obligation required by this Agreement and the Ancillary Agreements to which it is a party, to be so performed or complied with by it at or before the Closing.

14

(c)    Third-Party Consents.  Any and all Consents, if any, that the Purchaser is required to obtain from third parties (other than Governmental Authorizations contemplated by Section 5.2(e)) relating to this Agreement or the Ancillary Agreements or any of the other transactions contemplated hereby or thereby shall have been obtained.  Without limiting Section 4.6 (Purchaser's representation and warranty re no consents etc.), in the event that any Consents are required, Purchaser shall use its best efforts to obtain any such Consents.

(d)    No Actions or Proceedings.  No claim asserted in writing, action, suit, investigation or proceeding shall be pending or threatened before any court or governmental agency which presents a substantial risk of the restraint or prohibition of the Contemplated Transactions, other that any objections to the Sale Motion.

(e)    Government Authorizations.  All Governmental Authorizations, if any, that the Purchaser is required to obtain for the consummation of the Contemplated Transactions shall have occurred or been filed or obtained.  Without limiting Section 4.6 (Purchaser's representation and warranty re no Governmental Authorizations, etc.), in the event that any such Authorizations are required, Purchaser shall use its best efforts to obtain any such Authorizations.

(f)    Officer's Certificates.  The Purchaser shall have delivered to the Seller a certificate, dated the Closing Date and executed by a duly authorized officer of the Purchaser, certifying as to the fulfillment of the conditions specified in this Section 5.2.

(g)    Secretary's Certificate.  The Purchaser shall have delivered to the Seller at the Closing a certificate, dated the Closing Date and duly executed by the secretary or assistant secretary of the Purchaser, certifying as to (i) copies of the Governing Documents of the Purchaser, certified by an appropriate Governmental Body of the jurisdiction of its formation (to the extent such Governing Documents is so filed); and (ii) copies of the resolutions of the general partner of the Purchaser, authorizing and approving the execution, delivery and performance by the Purchaser of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the Contemplated Transactions.

(h)    Good Standing Certificate.  The Purchaser shall have delivered to the Seller a certificate from the Secretary of State (or other applicable Governmental Body) of its jurisdiction of organization as to the Purchaser's good standing in such jurisdiction.

(i)    Sale Order.  Issuance of the Sale Order by the Court in favor of the Purchaser as the buyer of the Purchased Assets and such order having been entered on the Court's docket and not less than eleven (11) days have passed without such order being appealed, stayed, amended or modified.

(j)    Purchaser's Financial Ability to Close.  The Purchaser shall have provided evidence to the Seller, acceptable to the Seller in its reasonable business judgment (but which may not be unreasonably withheld or delayed), that the Purchaser has sufficient funds, in the form of cash or equity funding commitments, loan commitments or otherwise, available for the purpose of Purchaser consummating the Contemplated Transactions at the Closing (the "Sufficient Available Funds").

15

## ARTICLE VI
## COVENANTS

6.1 <u>General</u>. Each of the parties hereto shall use its commercially reasonable best efforts, in good faith, to take all action and to do all things necessary, proper or advisable in order to consummate and make effective the Contemplated Transactions (including satisfaction, but not waiver, of the conditions set forth in Article V and execution and delivery of the agreements and instruments contemplated hereby to be executed and delivered at the Closing).

6.2 <u>Employees and Employee Benefits</u>.

(a) Information on Active Employees. For the purpose of this Agreement, the term "<u>Active Employees</u>" shall mean all employees employed on the Closing Date by the Seller, including employees on temporary leave of absence, including family medical leave, military leave, temporary disability or sick leave, but excluding employees on long-term disability leave.

(b) <u>Employment of Active Employees by the Purchaser</u>.

(i) The Purchaser is not obligated to hire any Active Employee but may interview all Active Employees. The Purchaser will provide the Seller with a list of Active Employees to whom the Purchaser has made an offer of employment that has been accepted to be effective on the Closing Date (the "<u>Hired Active Employees</u>"), provided that, so as not to chill the bidding at the auction, (x) such offers of employment and acceptances shall be effective only if the Purchaser is confirmed by the Court at the Sale Hearing as the winning bidder, and (y) the Purchaser shall not restrict the Active Employees from entering into similar arrangements with other potential purchasers, interviewing, or making or accepting inquiries regarding potential employment. Effective as of the Closing, the Seller will terminate the employment of all Hired Active Employees. The Seller hereby consents to the hiring of all Hired Active Employees by the Purchaser. The Seller hereby waives, effective as of the Closing, any claims or rights the Seller may have against any current or former employee of Seller under any employment, non-competition, non-solicitation, confidentiality or other restrictive covenant agreement.

(ii) It is understood and agreed that nothing in this Agreement shall constitute any commitment, Contract or understanding (expressed or implied) of any obligation on the part of the Purchaser to extend an offer of employment to any particular Active Employee, or, in the event an offer is extended, to a post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that the Purchaser may establish pursuant to individual offers of employment. Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of the Purchaser to terminate, reassign, promote or demote any of the Hired Active Employees after the Closing or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, benefits, other compensation or terms or conditions of employment of such employees.

16

(c)  No Transfer of Employee Benefit Plan Assets.  Neither the Seller nor its respective Related Persons will make any transfer of pension or other employee benefit plan assets to the Purchaser.

(d)  General Employee Provisions.

(i)  The Seller shall give any notices required by Law and take whatever other actions with respect to the plans, programs and policies described in this Section 6.2 as may be necessary to carry out the arrangements described in this Section 6.2.

(ii)  The Seller shall provide the Purchaser with such plan documents and summary plan descriptions, employee data or other information as may be reasonably required to carry out the arrangements described in this Section 6.2.

(iii)  If any of the arrangements described in this Section 6.2 are determined by the IRS or other Governmental Body to be prohibited by applicable Law, the Seller and the Purchaser shall modify such arrangements to as closely as possible reflect their expressed intent and retain the allocation of economic benefits and burdens to the parties contemplated herein in a manner that is not prohibited by applicable Law.

6.3  Certain Tax Matters.

(a)  All sales, use, transfer, stamp, conveyance, value added or other similar Taxes, duties, excises or governmental charges imposed by any Tax Authority, domestic or foreign, and all recording or filing fees, notarial fees and other similar costs of Closing with respect to the Contemplated Transactions will be borne by the Purchaser.

(b)  The Closing Consideration shall be allocated by Purchaser at the Closing pursuant to Treasury Regulation §1.1060-1(c) among the Purchased Assets and submitted to Seller for approval, not to be unreasonably withheld, provided that Seller shall be deemed to have approved such allocation if the Purchaser allocates not less than 95% of the Closing Consideration to Accounts Receivable and Inventories combined. After the Closing, except as otherwise required by applicable law or Governmental Body, the parties shall make consistent use of such allocation of the Closing Consideration among the Purchased Assets for all Tax purposes and in all filings, including declarations and reports filed with the IRS and any other Tax Authority in respect thereof, and including the reports required to be filed under Section 1060 of the Code.

6.4  Operation of Business.  Seller will operate the Business in the Ordinary Course of Business, including managing assets and liabilities in a manner consistent with past practice and using commercially reasonable best efforts to preserve and maintain the goodwill associated with the Business and the relationships with the employees, customers and suppliers of the Business.

6.5  Access.

(a)  Prior to the Closing, Seller will permit representatives of the Purchaser to have reasonable access during regular

17

business hours and upon reasonable notice, and in a manner so as not to interfere with the normal business operations of the Seller, to all premises, property, books, records (including Tax records), contracts, and documents of or pertaining to Seller, including reasonable access to perform whatever environmental testing the Purchaser deems appropriate in the course of its due diligence.

(b)     For purposes of this Section 6.5(b), with respect to each Executory Contract and Unexpired Lease that is specified by the Purchaser as necessary for the access to be provided to the Purchaser pursuant to this Section 6.5 (the "Access Period Agreements"), the "Seller Payment Period" shall be the period from the petition date for the Bankruptcy Case until the Closing Date and the "Purchaser Payment Period" shall be the period from and after the Closing Date until the earlier of (i) forty-five (45) days after the Closing Date and the date upon which the Court enters an order rejecting any such Executory Contract or Unexpired Lease.  The Seller shall be responsible for paying all rents, costs and other charges for the Seller Payment Period pursuant to the terms of the Access Period Agreements.  Provided that any necessary extension of the time to assume or reject the Access Period Agreements has been granted by the Court upon motion by Seller, then for forty-five (45) days following the Closing Date, the Seller will ensure that the Purchaser will have full access to each of the Seller's premises where the Purchased Assets are located, and will otherwise reasonably cooperate with the Purchaser, such that the Purchaser may access and remove any Purchased Assets from such premises, provided that Purchaser shall pay to the Seller (who shall pay over to the applicable counter-party) all rents, costs and other charges for the Purchaser Payment Period pursuant to the terms of the Access Period Agreements.. For sixty (60) days following the Closing Date, and subject to Section 1.1(h) (Seller's copies of or access to books and records), the Seller will ensure that the Purchaser will have access to and use of (upon reasonable notice) any equipment and software included among the Excluded Assets on which any Intellectual Property included among the Purchased Assets or other Purchased Assets may currently be stored (e.g. books and records, accounting information, customer files, etc.), and will otherwise reasonably cooperate with the Purchaser, such that the Purchaser may access and remove any Intellectual Property included among the Purchased Assets and such other Purchased Assets from such equipment or software.

6.6     Further Assurances.  The Purchaser and the Seller agree to take such further actions and execute such other documents as may be reasonably required to fulfill the conditions to Closing and, after Closing, to fully effect the Contemplated Transactions and further secure to each party the rights intended to be conferred hereby and the other agreements ancillary to the Contemplated Transactions

18

6.7    Notification of Certain Matters.  From the date of this Agreement until the earlier of the termination of this Agreement or the Closing, the Seller shall immediately provide written notice to the Purchaser upon the occurrence of any of the following:

(a)    Seller has taken any of the actions described in clauses (i), (ii) or (iii) of Section 7.1(h);

(b)    any change, circumstance, event, fact or condition that causes or constitutes a breach of any of the representations or warranties of the Seller set forth in this Agreement; or

(c)    any change, circumstance, event, fact or condition that prevents or is reasonably likely to prevent the Seller from complying with any of its obligations hereunder.

6.8    Notices to Customers.  On or before the Closing Date, the Purchaser shall use commercially reasonable efforts to cooperate with the Seller in providing an appropriate notice to customers.

6.9    Company Name.  Within thirty (30) days following the Closing Date, the Seller shall (a) change its company name to a name that does not include the word "ORCO" or any Intellectual Property, and (b) remove all signage and other designations that include the word "ORCO" or any Intellectual Property from any property or equipment not included among the Purchased Assets.  From and after the Closing Date, the Seller shall effect its dissolution and liquidation in accordance with the Bankruptcy Case and shall not engage in any business or other activity except as may be required to effect such dissolution and liquidation as provided herein, or otherwise to carry out any of the transactions contemplated by this Agreement.

## ARTICLE VII
## TERMINATION

7.1    Termination.  This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)    by Purchaser upon Seller's breach: by the Purchaser if a material Breach of any provision of this Agreement has been committed by the Seller and such Breach has not been waived by the Purchaser and has continued after notice to the Seller by the Purchaser without cure for a period of five (5) days (provided that Purchaser shall not have willfully Breached any provision of this Agreement, which Breach is not cured), provided that in the event of such termination the Deposit shall be returned to the Purchaser within one (1) business day;

(b)    by Seller upon Purchaser's breach: by the Seller if a material Breach of any provision of this Agreement has been committed by the Purchaser and such Breach has not been waived by the Seller and has continued after notice to the Purchaser by the Seller without cure for a period of five (5) days (provided that Seller shall not have willfully Breached any provision of this Agreement, which Breach is not cured), provided that in the event of termination of this Agreement under this Section 7.1(b) the Deposit shall be forfeited to the Seller;

ATLANTA:5126391.1

(c)     by the Purchaser in the following circumstances:

(i)     Seller's non-performance: if the conditions of any of the following Sections of this Agreement have not been satisfied, or if satisfaction of such a condition is or becomes impossible, other than through the failure of the Purchaser to comply with its obligations under this Agreement, and the Purchaser has not previously waived such condition: Section 1.10(a)(ii) (Seller Performance), Section 1.10(a)(iii) (Maintenance of Purchased Assets), Section 5.1(a) (Representations and Warranties of the Seller), Section 5.1(b) (Agreements and Covenants of the Seller), Section 5.1(e) (Bill of Sale), Section 5.1(g) (removal of Excluded Assets), Section 5.1(h) (Sale Order) provided that in the event of termination of this Agreement under this Section 7.1(c)(i) the Deposit shall be refunded to the Purchaser within one (1) business day;

(ii)     failure of conditions without fault of Purchaser: if, without fault of the Purchaser, the conditions of any of the following Sections of this Agreement have not been satisfied, or if satisfaction of such a condition is or becomes impossible, and the Purchaser has not previously waived such condition: Section 5.1(c) (Seller does not obtain Third Party Consents), Section 5.1(d) (Seller does not obtain Governmental Authorizations), Section 5.1(i) (No Actions or Proceedings) provided that in the event of termination of this Agreement under this Section 7.1(c)(ii) the Deposit shall be refunded to the Purchaser within one (1) business day;

(d)     by the Seller in the following circumstances:

(i)     Purchaser's non-compliance: if the conditions of any of the following Sections of this Agreement have not been satisfied, or if satisfaction of such a condition is or becomes impossible, other than through the failure of the Seller to comply with its obligations under this Agreement, and the Seller has not previously waived such condition: Section 1.10(b) (Purchaser Performance), Section 5.2(a) (Purchaser Representations, Warranties and Agreements), Section 5.2(b) (Purchaser Agreements and Covenants) provided that in the event of termination of this Agreement under this Section 7.1(d)(i) the Deposit shall be forfeited to the Seller;

(ii)     failure of conditions without fault of Seller: if, without fault of the Seller, the conditions of any of the following Sections of this Agreement have not been satisfied, or if satisfaction of such a condition is or becomes impossible, and the Seller has not previously waived such condition: Section 5.1(c) (Purchaser does not obtain Third Party Consents), Section 5.2(d) (No Actions or Proceedings), Section 5.1(e) (Purchaser does not obtain Governmental Authorizations), Section 5.2(i) (Sale Order) provided that in the event of termination of this Agreement under this Section 7.1(d)(ii) the Deposit shall be refunded to the Purchaser within one (1) business day;

(e)     by mutual consent: by mutual consent of the Purchaser and the Seller provided that in the event of such termination the Deposit shall be returned to the Purchaser within one (1) business day;

(f)     **[Intentionally omitted]**

ATLANTA:5126391.1

(g)     by passage of time: by either the Purchaser or the Seller (if such delay was not caused by actions or omissions of the Seller) if the Sale Order has not been entered on or before May 29, 2009, or if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before June 30, 2009, or such later date as the parties may agree upon provided that in the event of termination of this Agreement under this Section 7.1(g) the Deposit shall be returned to the Purchaser within one (1) business day.

(h)     by Purchaser if Seller takes certain actions:  by the Purchaser, at any time prior to the time, if any, when the Purchaser is confirmed as the winning bidder at the Sale Hearing, if the Seller has elected to (i) reject any Executory Contracts or Unexpired Leases, as provided in Section 1.2(a), or (ii) terminate more than 20% of the Seller's employees in the aggregate (based on the number of employees of Seller as of the date of this Agreement) provided that in the event of termination of this Agreement under this Section 7.1(h) the Deposit shall be returned to the Purchaser within one (1) business day.

7.2     Effect of Breach or Termination.

(a)     In general.  If this Agreement is terminated pursuant to Section 7.1, all further obligations of the parties under this Agreement will terminate without liability, except as provided in Section 7.2(b) below and except that the obligations in Section 1.8 (Deposit) and 9.1 (Expenses) will survive.  In the event of termination of this Agreement, the Deposit shall either be returned to Purchaser or forfeited to Seller, in accordance with the provisions of Section 7.1.

(b)     Specific performance.  If the conditions of Section 7.1 are satisfied, then either party may elect in lieu of termination of this Agreement to enforce this Agreement, and shall be entitled to a mandatory injunction enforcing specific performance of this Agreement.

(c)     **[Intentionally omitted.]**

## ARTICLE VIII
## RELEASE

8.1     Effective upon the Closing, the Seller, individually and on behalf of its affiliates, subsidiaries, parent companies, shareholders, successors, assigns, attorneys, representatives, agents, servants and the bankruptcy estate (collectively, the "Seller Parties"), hereby releases and forever discharges the Purchaser and each of its affiliates, subsidiaries, parent companies, partners, shareholders, successors, assigns, attorneys, officers, directors, representatives, agents, servants, former and current employees, as well as the attorneys, officers, directors, representatives, agents, servants, former and current employees of the Purchaser's affiliates, subsidiaries, parent companies, shareholders, successors, and assigns (collectively, "Purchaser Parties") from any and all past, present, and future rights, demands, claims, actions, or causes of action, whether in law or equity, for damages of every kind, character or description, costs, expenses, attorney's fees, compensation, consequential damages, punitive damages, liquidated damages, or any other things whatsoever, whether presently known or unknown, arising from, related to, or in any way connected to any act, omission, active negligence, passive negligence, tort or contractual obligation of any of the Purchaser Parties, or from any other theory of

21

recovery against any of the Purchaser Parties, occurring on, before, or after the Closing, except that the foregoing shall not release any rights, demands, claims, actions or causes of action with respect to or arising out of any Purchaser Party's breach of its obligations under the Agreement. The Seller on behalf of itself and all of the Seller Parties covenants and agrees not to commence, prosecute or assert, by way of claim or defense, against any of the Purchaser Parties any action, lawsuit, arbitration, or any other proceeding arising from, related to, or in any way connected to any of the rights, demands, claims, actions, or causes of action released in the foregoing sentence. As part of this Release, Seller Parties expressly consent to the hiring and/or solicitation of Seller Parties' current or former employees by any of the Purchaser Parties. As part of this Release, Seller Parties also expressly waive any and all past, present, or future rights, demands, claims, actions, or causes of action that the Seller Parties may have against any of the Purchaser Parties that are, in whole or in part, those arising from, related to, or in any way connected with employment agreement(s) and/or covenants related to confidentiality, trade secrets, solicitation of customers, and/or solicitation of Seller Parties' current or former employees.

The Seller (on behalf of itself and all of the Seller Parties) certifies that it has read, and understands, Section 1542 of the California Civil Code, which states:

> **"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

The Seller (on behalf of itself and all of the Seller Parties) hereby expressly waives the provisions of Section 1542 of the California Civil Code and any rights that the Seller and any of the Seller Parties may have thereunder as well as under any other statute or common law principle of similar effect. The Seller understands, acknowledges and agrees that one of the consequences of the Seller's waiver of Section 1542 of the California Civil Code is that even if the Seller or any of the Seller Parties should eventually suffer any damages by reason of any act or omission committed or caused by Purchaser or any of the Purchaser Parties prior to, on, or after the Closing Date, the Seller or such Seller Party will not be able to make any claims or prosecute any causes of action for those damages. The Seller further understands, acknowledges and agrees that the Seller consciously intends these consequences even as to claims which may exist as of the date hereof but which the Seller and the Seller Parties do not know exist and which, if known, would materially affect the Seller's decision to execute the releases herein, regardless of whether such lack of knowledge is the result of ignorance, oversight, error, negligence or any other cause. Finally, the Seller understands, acknowledges and agrees that the waiver by the Seller (on behalf of itself and all of the Seller Parties) of any rights that it may have under Section 1542 of the California Civil Code as well as under any other statute or common law principle of similar effect is an essential and material term of this Agreement and, without such waiver, this Agreement would not have been entered into by Purchaser.

8.2     Effective upon the Closing, the Purchaser, individually and on behalf of the other Purchaser Parties, hereby releases and forever discharges the Seller Parties from any and all past, present, and future rights, demands, claims, actions, or causes of action, whether in law or equity,

22

for damages of every kind, character or description, costs, expenses, attorney's fees, compensation, consequential damages, punitive damages, liquidated damages, or any other things whatsoever, whether presently known or unknown, arising from, related to, or in any way connected to any act, omission, active negligence, passive negligence, tort or contractual obligation of any of the Seller Parties, or from any other theory of recovery against any of the Seller Parties, occurring on or before the Closing, except that the foregoing shall not release any rights, demands, claims, actions or causes of action with respect to or arising out of any Seller Party's breach of its obligations under the Agreement. The Purchaser on behalf of itself and all of the Purchaser Parties covenants and agrees not to commence, prosecute or assert, by way of claim or defense, against any of the Seller Parties any action, lawsuit, arbitration, or any other proceeding arising from, related to, or in any way connected to any of the rights, demands, claims, actions, or causes of action released in the foregoing sentence. As part of this Release, Purchaser Parties also expressly waive any and all past, present, or future rights, demands, claims, actions, or causes of action that the Purchaser Parties may have against any of the Seller Parties that are, in whole or in part, those arising from, related to, or in any way connected with pre-Closing acts or omissions with respect to employment agreement(s) and/or covenants related to confidentiality, trade secrets, solicitation of customers, and/or solicitation of Purchaser Parties' current or former employees.

The Purchaser (on behalf of itself and all of the Purchaser Parties) certifies that it has read, and understands, Section 1542 of the California Civil Code, which states:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

The Purchaser (on behalf of itself and all of the Purchaser Parties) hereby expressly waives the provisions of Section 1542 of the California Civil Code and any rights that the Purchaser and any of the Purchaser Parties may have thereunder as well as under any other statute or common law principle of similar effect. The Purchaser understands, acknowledges and agrees that one of the consequences of the Purchaser's waiver of Section 1542 of the California Civil Code is that even if the Purchaser or any of the Purchaser Parties should eventually suffer any damages by reason of any act or omission committed or caused by Seller or any of the Seller Parties prior to or on the Closing Date, the Purchaser or such Purchaser Party will not be able to make any claims or prosecute any causes of action for those damages. The Purchaser further understands, acknowledges and agrees that the Purchaser consciously intends these consequences even as to claims which may exist as of the date hereof but which the Purchaser and the Purchaser Parties do not know exist and which, if known, would materially affect the Purchaser's decision to execute the releases herein, regardless of whether such lack of knowledge is the result of ignorance, oversight, error, negligence or any other cause. Finally, the Purchaser understands, acknowledges and agrees that the waiver by the Purchaser (on behalf of itself and all of the Purchaser Parties) of any rights that it may have under Section 1542 of the California Civil Code as well as under any other statute or common law principle of similar effect is an essential and material term of this Agreement and, without such waiver, this Agreement would not have been entered into by Seller.

23

**ARTICLE IX**
**GENERAL PROVISIONS**

9.1     Expenses.  Except as set forth in Article VII, whether or not the Contemplated Transactions are consummated, all costs and expenses incurred in connection with this Agreement, the Ancillary Agreements and the Contemplated Transactions shall be paid by the party incurring such expenses.

9.2     Amendment.  This Agreement may be amended or modified in whole or in part at any time by an agreement in writing among the Purchaser and the Seller.

9.3     Waiver.  Any term or provision of this Agreement may be waived in writing at any time by the Purchaser or by the Seller.  Any waiver effected by the Purchaser pursuant to this Section 9.3 shall be binding on the Purchaser, and any waiver effected by the Seller pursuant to this Section 9.3 shall be binding on the Seller.  No failure to exercise and no delay in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude the exercise of any other right, power or privilege.  No waiver of any Breach of any covenant or agreement hereunder shall be deemed a waiver of a preceding or subsequent Breach of the same or any other covenant or agreement.

9.4     Notices.   All notices, requests and other communications hereunder will be deemed to have been duly given only if delivered personally or by facsimile transmission or by an established express delivery company such as UPS or Federal Express or mailed (U.S. certified mail postage prepaid) to the parties at the following addresses or facsimile numbers:

> If to the Purchaser:
> HD Supply Construction Supply, Ltd.
> c/o HD Supply, Inc.
> 3100 Cumberland Blvd., Suite 1480
> Atlanta, Georgia 30339
> Attn: SVP, Strategic Business Development
> Fax: (770) 852-9454
>
> with a copy to:
> HD Supply Construction Supply, Ltd.
> c/o HD Supply, Inc.
> 3100 Cumberland Blvd., Suite 1480
> Atlanta, Georgia 30339
> Attention: General Counsel
> Fax: (770) 852-9466
>
> with a copy to:
> McKenna Long & Aldridge LLP
> 303 Peachtree Street, Suite 5300
> Atlanta, Georgia  30308
> Attn:  Jeremy Silverman
> Fax:  (404) 527-4198

24

ATLANTA:5126391.1

If to the Seller:
ORCO Construction Supply, Inc.
477 N. Canyons Parkway, Suite A
Livermore, CA  94551
Attention:      Peter C. Alexander
Facsimile:      (925) 960-6218

with a copy to:
Howard Rice Nemerovski Canady Falk & Rabkin,
A Professional Corporation
Three Embarcadero Center, Seventh Floor
San Francisco, CA  94111-4024
Attention:      Neil W. Bason
Facsimile:      (415) 217-5910

All such notices, requests and other communications will (i) if delivered personally or by express delivery to the address as provided in this Section 9.4, be deemed given upon delivery, (ii) if delivered by facsimile transmission to the facsimile number as provided in this Section 9.4, be deemed given upon written confirmation of receipt of such transmittal, and (iii) if delivered by mail in the manner described above to the address as provided in this Section 9.4, be deemed given upon actual receipt (in each case regardless of whether such notice, request or other communication is received by any other Person to whom a copy of such notice, request or other communication is to be delivered pursuant to this Section).  Any party from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other party hereto.

9.5    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

9.6    <u>Entire Agreement</u>.  The terms of this Agreement (including the Exhibits and Schedules hereto) and other documents and instruments referenced herein are intended by the parties as a final expression of their agreement with respect to the subject matter hereof and thereof and may not be contradicted by evidence of any prior or contemporaneous agreement except for the Ancillary Agreements.  The parties further intend that this Agreement and the Ancillary Agreements constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever may be introduced in any judicial proceeding, if any, involving this Agreement.

9.7    <u>No Third-Party Rights</u>.  The parties do not intend to confer any benefit hereunder on any Person, firm or corporation other than the parties hereto.

9.8    <u>Titles and Headings</u>.  Titles and headings of sections of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement.

25

9.9     Assignment.  This Agreement and the rights, duties and obligations hereunder may not be assigned by any party without the prior written consent of the other party, and any attempted assignment without consent shall be void; provided, however, that the Purchaser may, without obtaining the consent of any party hereto, assign any of its rights or obligations under this Agreement to any of its Affiliates or to its lenders as collateral security or to any Person that acquires (whether by merger, purchase of stock, purchase of assets or otherwise), or is the successor or surviving entity in any such acquisition, merger or other transaction involving, the Purchaser.

9.10    Successors and Assigns.  Subject to Section 9.9, this Agreement and the provisions hereof shall be binding upon each of the parties, their successors and permitted assigns.

9.11    Severability.  If any provision of this Agreement or any portion of any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, (a) such provision or portion thereof will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision or portion thereof had never comprised a part hereof, (c) the remaining provisions or portions thereof in this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or portion thereof or by the severance here from and (d) in lieu of such illegal, invalid or unenforceable provision or portion thereof, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision or portion thereof as similar in terms to such illegal, invalid or unenforceable provision or portion thereof as is possible.

9.12    Certain Interpretive Matters and Definitions.

        (a)     Unless the context otherwise requires, (i) all references to Sections, Articles or Schedules are to Sections, Articles or Schedules of or to this Agreement, (ii) each term defined in this Agreement has the meaning assigned to it, (iii) "or" is disjunctive but not necessarily exclusive, (iv) words in the singular include the plural and vice versa, (v) words of any gender include each other gender; the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (vi) the terms "subsidiary" and "associate" have the meanings given to those terms in Rule 12b-2 of Regulation 12B under the Exchange Act of 1934, as amended, (vii) each accounting term not otherwise defined herein has the meaning assigned to it in accordance with GAAP, (viii) the word "including" and similar terms following any statement will not be construed to limit the statement to matters listed after such word or term, whether or not a phrase of nonlimitation such as "without limitation" is used, and (ix) the term "business day" means any day on which banks are not required or authorized to close in San Francisco, California.

        (b)     The following terms shall have the meanings set forth below:

        "Accounts Receivable" means (i) all trade accounts receivable and other rights to payment from customers of the Seller and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of the Seller; (ii) all

ATLANTA:5126391.1

Case: 09-42847    Doc# 229-1    Filed: 05/15/09    Entered: 05/15/09 12:51:30    Page 28 of 57

other accounts or notes receivable of the Seller and the full benefit of all security for such accounts or notes; and (iii) any claim, remedy or other right related to any of the foregoing.

"Active Employees" has the meaning set forth in Section 6.2(a).

"Affiliate" means, with respect to any Person, any other Person or group of affiliated Persons directly or indirectly controlling (including without limitation all directors and executive officers of such Person), controlled by or under direct or indirect common control with such Person. For purposes of this definition, and without limiting the foregoing, (i) a Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such other Person, and (ii) any Related Person shall be deemed to be an Affiliate of such Person.

"Adjustment Period" has the meaning set forth in Section 1.7(c).

"Agreement" has the meaning set forth in the preamble hereto.

"Ancillary Agreements" has the meaning set forth in Section 1.3(c).

"Assumed Liabilities" has the meaning set forth in Section 1.4.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Base Amount" has the meaning set forth in Section 1.6.

"Bill of Sale" has the meaning set forth in Section 5.1(e).

"Business" has the meaning set forth in the Recitals.

"Breach" means if there is or has been a inaccuracy in or breach or violation of, or any failure to comply with or perform, such representation, warranty, covenant, obligation or other provision; and the term "Breach" shall be deemed to refer to any such inaccuracy, breach, failure, claim or circumstance.

"Calculation Period" has the meaning set forth in Section 1.7(b).

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.1.

"Closing Consideration" has the meaning set forth in Section 1.6.

"Closing Date" has the meaning set forth in Section 2.1.

"Code" means the Internal Revenue Code of 1986, as amended.

27

"Consent" means any approval, consent, ratification, waiver or other authorization.

"Contemplated Transactions" means on a collective basis the purchase and sale transactions all as set forth and as otherwise contemplated in this Agreement.

"Contract" means any agreement, contract, lease, consensual obligation, promise or undertaking (whether written or oral and whether express or implied), whether or not legally binding.

"Court" has the meaning set forth in the Recitals.

"Cure Amounts" has the meaning set forth in Section 1.2(b).

"Deposit" has the meaning set forth in Section 1.8.

"Encumbrance" means any liens, charges, security interests, pledges or other liabilities or encumbrances of any kind, nature or character.

"Excluded Assets" has the meaning set forth in Section 1.3.

"Excluded Liabilities" has the meaning set forth in Section 1.5.

"Executory Contracts and Unexpired Leases" has the meaning set forth in the Recitals.

"GAAP" means generally accepted accounting principles for financial reporting in the United States, applied on a consistent basis.

"Governmental Authorization" means any Consent, franchise, license, registration, permit, Order or approval issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, including, as the context may require, any declarations or filings with, or expiration of waiting periods imposed by, any such Governmental Body.

"Governmental Body" means any (i) nation, state, county, city, town, borough, village, district or other jurisdiction; (ii) federal, state, local, municipal, foreign or other government; (iii) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); (iv) multinational organization or body; (v) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; or (vi) official of any of the foregoing.

"Governing Documents" means, with respect to any particular entity, (i) if a corporation, the articles or certificate of incorporation and the bylaws; (ii) if a general partnership, the partnership agreement and any statement of partnership; (ii) if a limited partnership, the limited partnership agreement and the certificate of formation or certificate of limited partnership; (iv) if a limited liability company, the articles of organization and operating

28

agreement; (v) if another type of Person, any other charter or similar document adopted or filed in connection with the creation, formation or organization of the Person; (vi) all equityholders' agreements, partnership agreements, shareholder agreements, voting agreements, voting trust agreements, joint venture agreements, registration rights agreements or other agreements or documents relating to the organization, management or operation of any Person or relating to the rights, duties and obligations of the equityholders of any Person; and (vii) any amendment or supplement to any of the foregoing.

"Hazardous Materials" means: (i) any petroleum, waste oil, crude oil, asbestos, urea formaldehyde or polychlorinated biphenyl; (ii) any waste, gas or other substance or material that is explosive or radioactive; (iii) any "hazardous substance," "pollutant," "contaminant," "hazardous waste," "regulated substance," "hazardous chemical" or "toxic chemical" as designated, listed or defined (whether expressly or by reference) in any statute, regulation or other Law); (iv) any other substance or material (regardless of physical form) or form of energy that is subject to any Law which regulates or establishes standards of conduct in connection with, or which otherwise relates to, the protection of human health, plant life, animal life, natural resources, property or the enjoyment of life or property from the presence in the environment of any solid, liquid, gas, odor, noise or form of energy; and (v) any compound, mixture, solution, product or other substance or material that contains any substance or material referred to in clause "(i)", "(ii)", "(iii)" or "(iv)" above.

"Hired Active Employees" has the meaning set forth in Section 6.2(b)(i).

"Intellectual Property" means all trademarks (including the trademark "Orco"), trade names, corporate names, company names, business names, product or brand names, service marks, patents, copyrights (including but not limited to moral rights), and any applications for or registrations of any of the foregoing, works of authorship, know-how, logos, proprietary information, protocols, schematics, specifications, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, URLs, domain names, web sites, works of authorship and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries) inventions, trade secrets and any other intellectual property or intangible property that are used in the Business as presently conducted and any rights relating to any of the foregoing.

"Inventories" means all inventories of goods held by the Seller for sale associated with the Business, wherever located.

"IRS" means the Internal Revenue Service.

"Law" means any applicable federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"Leases" means the interest of Seller in real property, as tenant, subtenant or otherwise, in any leases, ground leases, subleases and other instruments and agreements, together with all amendments, modifications and supplements thereto (if any), and all rights and interests

29

ATLANTA:5126391.1

of Seller relating thereto, whether held directly by Seller or indirectly through an agent or nominee (including but not limited to all easements, licenses, rights-of-way, permits and other appurtenances thereto, as well as all purchase options, renewal options, rights of first refusal, rent credits and expansion rights, if any).

"Liability" means any and all obligations, liabilities, debts and commitments, whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, due or to become due, whenever or however arising (including, without limitation, whether arising out of any contract or tort based on negligence, strict liability, or otherwise) and whether or not the same would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"Master Contract and Lease List" has the meaning set forth in Section 1.2(b).

"Material Adverse Effect" means any change, circumstance, or effect that does have, or reasonably could be expected to have, a materially adverse effect on the operations, assets, properties, prospects, condition (financial or other) or results of operations of (a) the Seller and the Business, prior to the Closing, and (b) the Purchaser and the Business, from and after the Closing, or the ability of any of the parties hereto to consummate the Contemplated Transactions.

"Order" means any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, Governmental Body, or by any arbitrator, of competent jurisdiction.

"Ordinary Course of Business" shall mean an action taken by a Person only if: (i) such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person; (ii) such action is not required to be authorized by the board of directors of such Person (or by any Person or group of Persons exercising similar authority); and (iii) such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business as such Person.

"Other Assets" has the meaning set forth in Section 1.1(k).

"Person" means an individual, partnership, corporation, business trust, limited liability company, limited partnership, limited liability partnership, joint stock company, trust, unincorporated association, joint venture or any other entity, or a Governmental Body.

"Purchase Price" has the meaning set forth in Section 1.6.

"Purchased Assets" has the meaning set forth in the Recitals.

"Purchaser" has the meaning set forth in the preamble hereto.

"Purchaser Parties" has the meaning set forth in Section 8.1.

ATLANTA:5126391.1

"Related Person" means:

(i)     With respect to a particular individual: (A) each other member of such individual's Family; (B) any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family; and (C) any Person in which such individual or members of such individual's Family hold (individually or in the aggregate) a Material Interest.

(ii)     With respect to a specified Person other than an individual: (A) any Person that directly or indirectly controls, is directly or indirectly controlled by, or is directly or indirectly under common control with such specified Person; and (B) any Person that holds a Material Interest in such specified Person.

For purposes of this definition, (a) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse, and (iii) any other natural person who is related to the individual or the individual's spouse within the second degree, (b) "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of voting or equity securities or other voting or equity interests representing over 50% of the outstanding voting power of a Person or equity securities or other equity interests in a Person.

"Sale Hearing" has the meaning set forth in the Recitals.

"Sale Motion" means the Seller's motion for an order approving the terms and conditions of this Agreement, which such motion shall be substantially in the form filed with the Court on May 7, 2009.

"Sale Order" has the meaning set forth in Section 1.9(a).

"Seller" has the meaning set forth in the preamble hereto.

"Seller Parties" has the meaning set forth in Section 8.1.

"Statement" has the meaning set forth in Section 1.7(d).

"Sufficient Available Funds" has the meaning set forth in Section 5.2(j).

"Tangible Personal Property" means all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property (other than Inventories) of every kind owned by the Seller (wherever located and whether or not carried on the Seller's books), together with any express or implied warranty by the manufacturers or sellers of any item or component part thereof and all maintenance records and other documents relating thereto.

"Tax" means (i) any net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit tax, custom duty or other tax, governmental fee or other like assessment or charge

31

of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Tax Authority, (ii) any Liability for the payment of any amounts of the type described in (i) as a result of being a member of an affiliated, consolidated, combined, unitary or aggregate group for any taxable period, and (iii) any Liability for the payment of any amounts of the type described in (i) or (ii) as a result of being a transferee of or successor to any Person or as a result of any express or implied obligation to indemnify any other Person.

"Tax Authority" means any Governmental Body responsible for the imposition or collection of any Tax.

"Tax Return" means any return, statement, report or form (including, without limitation, estimated tax returns and reports, withholding tax returns and reports and information returns and reports) required to be filed with respect to Taxes.

"Working Capital" has the meaning set forth in Section 1.7.

"Working Capital Adjustment" has the meaning set forth in Section 1.7.

(c)      All references to "$" or dollar amounts will be to lawful currency of the United States of America.

(d)      Any representation or warranty contained herein as to the enforceability of a contract shall be subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or other similar law affecting the enforcement of creditors' rights generally and to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(e)      No provision of this Agreement will be interpreted in favor of, or against, either of the parties hereto by reason of the extent to which either such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof.

9.13    DAMAGES.    NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, SPECIAL, INDIRECT OR PUNITIVE DAMAGES (INCLUDING LOST PROFITS, LOSS OF PRODUCTION OR OTHER DAMAGES ATTRIBUTABLE TO BUSINESS INTERRUPTION) ARISING UNDER OR IN CONNECTION WITH THIS PURCHASE AGREEMENT.

9.14    Governing Law.    This Agreement shall be governed by and construed in accordance with the internal laws of the State of California, without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California.

*(Signature page follows.)*

32

      **IN WITNESS WHEREOF**, the parties have caused this Asset Purchase Agreement to be duly executed and delivered as of the date first set forth above.

**SELLER**                         **ORCO CONSTRUCTION SUPPLY, INC.,**
                                             **a California corporation**

                                             _____

                                             Peter C. Alexander
                                           President & Chief Executive Officer

**PURCHASER**                     **HD SUPPLY CONSTRUCTION SUPPLY, LTD.**
                                             **a Florida limited partnership (dba WhiteCap)**

                                           By:    HD Supply GP & Management, Inc., its general partner

                                             By:_____
                                           Name:
                                           Title:
                                           Its: Authorized Signatory

33

Schedule 1.1(d) (Governmental Authorization etc.)

**NONE**

Schedule 1.1(i) (telephone, telex, fax, domain names and websites)

| Location | Phone Number or Range | Type |
|----------|----------------------|------|
| **Bloomington** | 909-873-3340 to 3379 | DID Range |
| | 909-874-5809 | Analog |
| | 909-874-5832 | Analog |
| | 909-874-5838 | Analog |
| | 909-874-5864 | Analog |
| | 909-874-5881 | Analog |
| | 909-874-5884 | Analog |
| **Carlsbad** | 760-438-2292 | DID |
| | 760-438-4385 | DID |
| | 760-438-9664 | DID |
| | 760-268-7521 to 7536 | DID Range |
| | 760-918-2800 to 2819 | DID Range |
| | 760-438-7622 | Analog |
| | 760-431-1625 | Analog |
| | 760-431-6737 | Analog |
| | 760-431-6748 | Analog |
| | 760-438-7630 | Analog |
| | 760-268-1086 | Analog |
| **Colton** | 909-824-0237 | DID |
| | 909-824-0948 | DID |
| | 909-824-1244 | DID |
| | 909-825-8240 | DID |
| | 909-825-8728 | DID |
| | 909-422-3720 to 3759 | DID Range |
| | 909-422-8140 to 8154 | DID Range |
| | 909-824-0967 | Analog |
| | 909-824-3099 | Analog |
| | 909-824-9096 | Analog |
| | 909-824-9097 | Analog |
| | 909-824-9481 | Analog |
| | 909-824-9482 | Analog |
| | 909-824-9483 | Analog |
| | 909-825-8207 | Analog |
| | 909-825-9603 | Analog |
| | 909-825-9635 | Analog |
| | 909-825-9636 | Analog |
| | 909-825-9637 | Analog |
| | 908-824-7250 | Analog |

| Location | Phone Number or Range | Type |
|---|---|---|
|  | 909-783-1970 | Analog |
|  | 909-824-6479 | Analog |
| **Corporate** | 925-960-6100 to 6299 | DID Range |
|  | 925-373-3295 | Analog |
|  | 925-243-1986 | Analog |
|  | 925-373-3571 | Analog |
|  | 925-373-3847 | Analog |
|  | 925-373-6349 | Analog |
|  | 925-606-6372 | Analog |
|  | 925-606-6385 | Analog |
|  | 925-606-6397 | Analog |
|  | 925-606-6440 | Analog |
|  | 925-373-8575 | Analog |
| **Goodyear** | 480-655-3162 to 3191 | DID Range |
|  | 480-655-3900 to 3909 | DID Range |
|  | 623 932-0031 | Analog |
|  | 623 932-3472 | Analog |
|  | 623-882-1111 | Analog |
|  | 623 932-3705 | Analog |
| **Las Vegas** | 702-633-5851 | DID |
|  | 702-633-5864 | DID |
|  | 702-633-8561 | DID |
|  | 702-932-9300 | DID |
|  | 702-531-7700 to 7739 | DID Range |
|  | 702-633-4705 | Analog |
|  | 702-633-0991 | Analog |
| **Livermore** | 925-294-9200 | DID |
|  | 925-294-5190 | DID |
|  | 925-454-1617 | DID |
|  | 925-294-5192 to 5194 | DID Range |
|  | 925-373-8576 to 8577 | DID Range |
|  | 925-373-3060 to 3071 | DID Range |
|  | 925-245-4700 to 4719 | DID Range |
|  | 925-960-1184 | Analog |
|  | 925-960-1291 | Analog |
|  | 925-960-9053 | Analog |
|  | 925-960-9057 | Analog |
|  | 925-960-9542 | Analog |
| **Mesa** | 480-361-0440 | DID Range |
|  | 480-361-0176 to 0179 | DID Range |

| Location | Phone Number or Range | Type |
|---|---|---|
| | 480-361-0502 to 0527 | DID Range |
| | 480-926-1426 | DID |
| | 480-361-4060 | DID |
| | 480-361-0442 to 0445 | DID Range |
| | 480-926-0946 | DID |
| | 480-926-2447 | DID |
| | 480-926-5247 | DID |
| | 480-461-6009 | Analog |
| | 480-461-6021 | Analog |
| **Modesto** | 209-545-5216 | DID |
| | 209-545-1266 | DID |
| | 209-545-5230 | DID |
| | 209-545-6420 | DID |
| | 209-545-6422 | DID |
| | 209-545-6423 | DID |
| | 209-545-6425 | DID |
| | 209-545-6427 to 6439 | DID Range |
| | 209-543-3220 to 3239 | DID Range |
| | 209-543-1734 | Analog |
| | 209-543-3680 | Analog |
| | 209-545-0232 | Analog |
| | 209-545-2370 | Analog |
| | 209-545-2655 | Analog |
| | 209-545-2756 | Analog |
| | 209-545-2831 | Analog |
| | 209-545-2838 | Analog |
| | 209-545-5014 | Analog |
| | 209-545-5367 | Analog |
| **Rocklin** | 916-543-7500 to 7539 | DID Range |
| | 916-543-7813 | Analog |
| | 916-543-7828 | Analog |
| | 916-543-7832 | Analog |
| **San Jose** | 408-729-6601 | DID |
| | 408-729-0388 | DID |
| | 408-729-6697 | DID |
| | 408-729-7095 | DID |
| | 408-729-2120 to 2139 | DID Range |
| | 408-254-8003 to 8018 | DID Range |
| | 408-729-0230 | Analog |
| | 408-729-8032 | Analog |

| Location | Phone Number or Range | Type |
|---|---|---|
| | 408-729-8840 | Analog |
| | 408-729-8347 | Analog |
| | 408-254-1926 | Analog |
| | 408-254-3096 | Analog |
| **Santa Ana** | 714-556-8300 | DID |
| | 714-556-6810 | DID |
| | 714-556-7215 | DID |
| | 714-424-4200 to 4219 | DID Range |
| | 714-427-5069 to 5085 | DID Range |
| | 714-437-9737 | Analog |
| | 714-556-8300 | Analog |
| **Stockton** | 209-941-1080 to 1099 | DID Range |
| | 209-234-1095 | Analog |
| | 209-234-2768 | Analog |
| | 209-234-3854 | Analog |
| | 209-234-3850 | Analog |
| **Sun Valley** | 818-504-3170 | DID |
| | 818-504-3178 | DID |
| | 818-514-0561 | DID |
| | 818-771-1740-1756 | DID Range |
| | 818-771-1780-1799 | DID Range |
| | 818-252-4689 | Analog |
| | 818-252-4698 | Analog |
| | 818-252-4864 | Analog |
| | 818-252-6430 | Analog |
| | 818-252-6923 | Analog |
| | 818-252-7231 | Analog |
| | 818-252-7246 | Analog |
| | 818-252-7922 | Analog |
| | 818-252-7936 | Analog |
| | 818-252-7941 | Analog |
| | 818-252-7957 | Analog |
| | 818-252-7970 | Analog |
| | 818-504-0561 | Analog |
| | 818-504-6857 | Analog |
| | 818-767-7139 | Analog |
| | 818-504-0573 | Analog |
| **Toll Free** | 800-595-6726 | Toll Free |
| | 888-289-6726 (888-BUY-ORCO) | Toll Free |
| | 888-480-6726 (ORCO) | Toll Free |

ATLANTA:5126391.1

| Location | Phone Number or Range | Type |
|---|---|---|
| | 888-551-6726 (ORCO) | Toll Free |
| | 888-575-6726 (ORCO) | Toll Free |
| | 888-621-6726 (ORCO) | Toll Free |
| | 888-756-6726 (ORCO) | Toll Free |
| | 888-840-6726 (ORCO) | Toll Free |
| | 888-870-6726 (ORCO) | Toll Free |
| | 888-879-6726 (ORCO) | Toll Free |
| | 888-900-6726 (ORCO) | Toll Free |
| | 888-909-6726 (ORCO) | Toll Free |
| | 888-757-6726 (ORCO) | Toll Free |

| Domain Name | Expiration |
|---|---|
| BADORCO.COM | 8/31/2009 |
| BRINGITONORCO.COM | 8/31/2009 |
| BRINGITONORCO.NET | 8/31/2009 |
| BUYORCO.COM | 12/1/2009 |
| FUCKORCO.COM | 8/31/2009 |
| MYORCO.COM | 11/17/2009 |
| ORCO.NET | 2/13/2010 |
| ORCOBRINGITON.COM | 8/31/2009 |
| ORCOBRINGITON.NET | 8/31/2009 |
| ORCOCONSTRUCTION.BIZ | 3/28/2010 |
| ORCOCONSTRUCTION.COM | 2/13/2010 |
| ORCOCONSTRUCTION.NET | 8/31/2009 |
| ORCOCONSTRUCTION.ORG | 8/31/2009 |
| ORCOCONSTRUCTION.US | 3/28/2010 |
| ORCOCONSTRUCTIONSUPPLY.BIZ | 8/30/2009 |
| ORCOCONSTRUCTIONSUPPLY.COM | 2/13/2010 |
| ORCOCONSTRUCTIONSUPPLY.INFO | 8/31/2009 |
| ORCOCONSTRUCTIONSUPPLY.NET | 8/31/2009 |
| ORCOCONSTRUCTIONSUPPLY.ORG | 8/31/2009 |
| ORCOCONSTRUCTIONSUPPLY.US | 8/30/2009 |
| ORCODIRECT.COM | 8/31/2009 |
| ORCODIRECT.NET | 8/31/2009 |

| Location | Phone Number or Range | Type |
|---|---|---|
| ORCOEDGE.COM | | 8/31/2009 |
| ORCOEDGE.NET | | 8/31/2009 |
| ORCOFOUNDATION.COM | | 8/31/2009 |
| ORCOFOUNDATION.NET | | 8/31/2009 |
| ORCOREBAR.COM | | 8/31/2009 |
| ORCOREBAR.NET | | 8/31/2009 |
| ORCOSUCKS.COM | | 8/31/2009 |
| ORCOSUPPLY.COM | | 2/13/2010 |
| ORCOSUPPLY.NET | | 8/31/2009 |
| ORCOUSA.BIZ | | 8/30/2009 |
| ORCOUSA.COM | | 2/17/2010 |
| ORCOUSA.INFO | | 8/31/2009 |
| ORCOUSA.NET | | 2/17/2010 |
| ORCOUSA.ORG | | 2/17/2010 |
| ORCOUSA.US | | 8/30/2009 |
| SCREWORCO.COM | | 8/31/2009 |
| SERVICEALWAYSMATTERS.COM | | 11/26/2009 |

<u>Schedule 1.1(j) (Other Assets)</u>

**NONE**

Schedule 1.2 (Purchaser's designation of Executory Contracts and Unexpired Leases sought to be assumed and assigned, and proposed cure amounts)

| Executory Contracts and Unexpired Leases to be Assumed by the Purchaser | Proposed Cure Amounts | | Other Conditions |
|---|---|---|---|
| | Pre-Petition Amounts Owed | Per Diem Post-Petition Amount | |
| 1. The Lease Agreement, dated August 1, 1998, as amended by that certain Lease Addendum dated August 15, 2006 and as further amended by that certain First Amendment dated August 15, 2006, by and between the Seller, as tenant, and The Rose Children's Trust UTD March 1, 1991, for certain premises located at 2650 S. La Cadena Drive, Colton, California 92324 (the "Colton Lease") | None (Waived by Landlord) | None (to be paid by the Seller) | 1. If the Court determines that the actual Cure Amount for any Executory Contract or Unexpired Lease to be assumed by the Purchaser is greater than the Cure Amount listed in this Schedule 1.2, then the Purchaser may remove such Executory Contract or Unexpired Lease from this list of Executory Contracts and Unexpired Leases to be assumed by the Purchaser by notice filed with the Court and served on the Seller and the non-Debtor parties to such contract or lease within 10 days after the Court's determination of the Cure Amount.

2. Concurrent with the Closing, the Purchaser and the relevant non-Debtor party will enter into an Amendment to Lease Agreement for each of the Colton Lease and the Carlsbad Lease, which Amendments to Lease Agreement are attached to this Agreement as Exhibits 1.2(a) and 1.2(b), respectively. |
| 2. The Lease Agreement, dated September 1, 1995, as amended by that certain Lease Addendum dated October 16, 1995 and as further amended by that certain First Amendment dated August 15, 2006, by and between the Seller, as tenant, and The Rose Children's Trust UTD March 1, 1991, as landlord, for certain premises located at 6125 Paseo Del Norte, Carlsbad, California 92009 (the "Carlsbad Lease") | None (Waived by Landlord) | None (to be paid by the Seller) | |
| 3. The unfulfilled portion of any purchase orders entered into by customers of the Seller and the Seller prior to the Closing | N/A | N/A | |

In addition, the Purchaser proposes to have the Seller assume and assign to the Purchaser the real property leases listed below, contingent upon the counterparty to each such lease (a) agreeing to a cure amount, if any, with respect to such lease that is acceptable to the Purchaser and (b)

agreeing to terms, conditions and revisions with respect to such leases that are acceptable to the Purchaser:

1.  Triple Net Lease Agreement, dated January 7, 1997, by and between the Seller, as tenant, and Herndon Family Trust, as landlord, for certain premises located at 2313 Mendenhall, Suite A, North Las Vegas, Nevada, as amended and extended (the "N. Las Vegas Lease").

2.  Commercial Lease, dated September 1, 1995, as amended by that certain First Amendment to Lease dated August 15, 2006, by and between the Seller, as tenant, and MELD Properties, as landlord, for certain premises located at 1375 Rutan Ct., Livermore, California 94550 (the "Livermore Lease").

3.  Standard Industrial/Commercial Multi-Tenant Lease-Gross, dated July 25, 2005, as amended by that certain First Amendment to Lease dated January 27, 2006, by and between the Seller, as tenant, and Buttram Goodyear Commerce Center LLC, as landlord, for certain premises located at 520 North Bullard Avenue, Suite 37, Goodyear, Arizona 85338 (the "Goodyear Lease").

4.  Standard Industrial/Commercial Multi-Tenant Lease-Net, dated September 21, 2005, as amended by Lease Amendment No. 1 dated March 6, 2007, by and between the Seller, as tenant, and Marvin L. Oates Trust, as landlord, for certain premises located at 3725 Cincinnati Avenue, Suite 200, Rocklin, California  95765 (the "Rocklin Lease").

5.  Standard Industrial/Commercial Single-Tenant Lease-Gross, dated June 25, 2004, by and between the Seller, as tenant, and A. Glenn Hoiby and Cora M. Hoiby 1977 Trusts, as landlord, for certain premises located at 8500 Lankershim Avenue, Sun Valley, California 91352 (the "Sun Valley Lease").

6.  Standard Industrial/Commercial Single-Tenant Lease-Gross, dated June 25, 2004, by and between the Seller, as tenant, and Carrangle Partners, as landlord, for certain premises located at 11671 Tuxford Street, Sun Valley, California  91352 (the "Sun Valley Yard Lease").

7.  Industrial Property Net Lease, dated September 1, 1998, as amended by a First Amendment of Lease dated June 8, 2007, by and between the Seller, as tenant, and Hertz Realty, Inc., as landlord, for certain premises located at 1460 E. Taylor (Mabury) Street, San Jose, California 95133 (the "San Jose Lease").

8  Standard Industrial Lease, dated April 5, 2001, by and between the Seller, as tenant, and Rex Kuwasaki and Loren Peiterson d/b/a The Peiterson Limited Partnership, as landlord, for certain premises located at 39 W Hampton Avenue, Mesa, California 85210, as amended and extended (the "Mesa Lease").

<u>Exhibit 1.2(a) (Amendment to the Colton Lease)</u>

**<u>AMENDMENT TO LEASE AGREEMENT</u>**

This AMENDMENT TO LEASE AGREEMENT (this "Amendment") is made and entered into as of the ___ day of _____, 2009, by and between THE ROSE CHILDREN'S TRUST UTD MARCH 1, 1991 ("Landlord"), and HD SUPPLY CONSTRUCTION SUPPLY, LTD., a Florida limited partnership ("Tenant").

BACKGROUND

A.   Landlord and Tenant (or their predecessors in interest) are parties to that certain Lease Agreement, dated August 1, 1998, as amended by that certain Lease Addendum dated August 15, 2006 and as further amended by that certain First Amendment dated August 15, 2006 (as amended, the "Lease"), for certain premises located at 2650 S. La Cadena Drive, Colton, California (the "Premises"); and

B.   Landlord and Tenant desire to amend the Lease, upon the terms and conditions contained herein.

AGREEMENT

For and in consideration of the foregoing, and the covenants and agreements contained in the Lease, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.   <u>Recitals; Definitions; Expiration</u>.  The foregoing Background statements are true, correct and complete.  All capitalized terms used herein and not otherwise defined herein shall have the meanings given them in the Lease and are incorporated herein by this reference.  The Lease expired by its terms on August 31, 2008 and the parties desire to reinstate and do hereby reinstate the Lease.

2.   <u>Rental Payment</u>. Commencing _____, the rent payable by Tenant under the Lease shall be $12,150.00 (intended to be 80% of current rental amount), payable monthly and otherwise in accordance with the Lease.  Paragraph 4 of the Lease is hereby amended accordingly.

3.   <u>Term of Lease</u>.  The term of the Lease shall expire on August 31, 2011, unless otherwise extended.

4.   <u>Notices</u>.  The Lease is hereby amended to amend the notice address for Tenant as follows:

HD Supply Construction Supply, Ltd.

    c/o HD Supply, Inc.
    501 W. Church Street
    Orlando, Florida 32805
    Attn:  Real Estate Department

    With a copy to:

    HD Supply Construction Supply, Ltd.
    Attn:  Real Estate Sr. Manager
    2975 Redhill Avenue, Suite 100
    Costa Mesa, California 92626

No notices, bills or invoices from Landlord to Tenant shall be delivered or mailed to Tenant at the Premises.

   5.  <u>Additional Extension Terms</u>.  Tenant shall have three additional renewal options for three (3) years each on the same terms and conditions as the Lease, as amended hereby.  Rent during the first extension shall be $12,150.00 per month, Rent during the second extension shall be $12,750.00 per month and Rent during the third extension shall be $13,400.00. Tenant must notify Landlord of its intent to renew at least thirty (30) days prior to (a) the end of the Extension Term, and (b) if the first and second renewal options are exercised, the end of the first and second renewal option term.

   6.  <u>Counterpart Execution.</u> This Amendment may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

   7.  <u>No Further Amendments</u>.  Except as otherwise expressly provided herein, all terms and conditions of the Lease remain in full force and effect. This Amendment, together with the Lease, is the complete understanding between the parties and supersedes all other prior agreements and representations concerning its subject matter.  To the extent of any inconsistency between the Lease and this Amendment, the terms of this Amendment shall control.

     [execution on following page]

ATLANTA:5126391.1

Case: 09-42847  Doc# 229-1  Filed: 05/15/09  Entered: 05/15/09 12:51:30  Page 47 of 57

IN WITNESS WHEREOF, Landlord and Tenant have caused this Amendment to be executed and delivered effective as of the date set forth above.

LANDLORD:

The Rose Children's Trust UTD March 1, 1991

By:_____
Name:
Its:

Address for notices:

_____
_____
_____


TENANT:

HD Supply Construction Supply, Ltd.,
a Florida limited partnership

By:     HD Supply GP & Management, Inc., its general partner

        By:_____
        Name:
        Title:
        Its: Authorized Signatory

Exhibit 1.2(b) (Amendment to the Carlsbad Lease)

## AMENDMENT TO LEASE AGREEMENT

This AMENDMENT TO LEASE AGREEMENT (this "Amendment") is made and entered into as of the ___ day of _____, 2009, by and between THE ROSE CHILDREN'S TRUST UTD MARCH 1, 1991 ("Landlord"), and HD SUPPLY CONSTRUCTION SUPPLY, LTD., a Florida limited partnership ("Tenant").

### BACKGROUND

A.   Landlord and Tenant (or their predecessors in interest) are parties to that certain Commercial Lease, dated September 1, 1995, as amended by that certain Lease Addendum dated October 16, 1995 and as further amended by that certain First Amendment dated August 15, 2006 (as amended, the "Lease"), for certain premises located at 6125 Paseo Del Norte, Carlsbad, California (the "Premises"); and

B.   Landlord and Tenant desire to amend the Lease, upon the terms and conditions contained herein.

### AGREEMENT

For and in consideration of the foregoing, and the covenants and agreements contained in the Lease, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.   <u>Recitals; Definitions</u>.  The foregoing Background statements are true, correct and complete.  All capitalized terms used herein and not otherwise defined herein shall have the meanings given them in the Lease and are incorporated herein by this reference.

2.   <u>Rental Payment</u>. Commencing _____, the rent payable by Tenant under the Lease shall be $9,575.00 (intended to be 80% of current rental amount), payable monthly and otherwise in accordance with the Lease.  The rent schedule attached to the First Amendment to Lease is hereby amended accordingly.

3.   <u>Term of Lease</u>.  The term of the Lease shall expire on August 31, 2010, unless otherwise extended.

4.   <u>Notices</u>.  The Lease is hereby amended to amend the notice address for Tenant as follows:

HD Supply Construction Supply, Ltd.
c/o HD Supply, Inc.
501 W. Church Street

ATLANTA:5126391.1

Orlando, Florida 32805
Attn: Real Estate Department

With a copy to:

HD Supply Construction Supply, Ltd.
Attn: Real Estate Sr. Manager
2975 Redhill Avenue, Suite 100
Costa Mesa, California 92626

No notices, bills or invoices from Landlord to Tenant shall be delivered or mailed to Tenant at the Premises.

5.      Additional Extension Terms.  Tenant shall have three additional renewal options for three (3) years each on the same terms and conditions as the Lease, as amended hereby.  Rent during the first extension shall be $9,575.00 per month, Rent during the second extension shall be $10,050.00 per month and Rent during the third extension shall be $10,550.00. Tenant must notify Landlord of its intent to renew at least thirty (30) days prior to (a) the end of the Extension Term, and (b) if the first and second renewal options are exercised, the end of the first and second renewal option term.

6.      Counterpart Execution. This Amendment may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

7.      No Further Amendments.  Except as otherwise expressly provided herein, all terms and conditions of the Lease remain in full force and effect. This Amendment, together with the Lease, is the complete understanding between the parties and supersedes all other prior agreements and representations concerning its subject matter.  To the extent of any inconsistency between the Lease and this Amendment, the terms of this Amendment shall control.

[execution on following page]

IN WITNESS WHEREOF, Landlord and Tenant have caused this Amendment to be executed and delivered effective as of the date set forth above.


LANDLORD:

The Rose Children's Trust UTD March 1, 1991

By:_____
Name:
Its:

Address for notices:

_____
_____
_____


TENANT:

HD Supply Construction Supply, Ltd.,
a Florida limited partnership

By:     HD Supply GP & Management, Inc., its general partner

        By:_____
        Name:
        Title:
        Its: Authorized Signatory

Schedule 1.3(l) (additional Excluded Assets not otherwise included in Section 1.3)

1.    **Certain Inventories** - Any Inventories the Purchaser elects, in its sole discretion and upon its inspection of such Inventories on or prior to the Closing Date, to exclude from the scope of the Purchased Assets (the "Excluded Inventories").  The Purchaser shall designate any Excluded Inventories in writing to the Seller on or prior to the Closing Date.

2.    **Certain Tangible Personal Property** - Any Tangible Personal Property the Purchaser elects, in its sole discretion and upon its inspection of such Tangible Personal Property on or prior to the Closing Date, to exclude from the scope of the Purchased Assets (the "Excluded Personal Property").  The Purchaser shall designate any Excluded Personal Property in writing to the Seller on or prior to the Closing Date.

3.    **Leased Assets -** Any assets leased by the Seller, except to the extent such assets are leased pursuant to the Executory Contracts and Unexpired Leases set forth on Schedule 1.2.

       **NOTE:** This Schedule 1.3(l) shall have no effect on the calculation of Working Capital set forth in Section 1.7.

Schedule 1.4 (Assumed Liabilities not otherwise listed)

**NONE**

ATLANTA:5126391.1

Schedule 3.5

As an exception to Section 3.5 (No Brokers or Finders), the Seller is a party to that certain letter Agreement, dated November 5, 2008, between the Seller and M&A Capital, LLC, a copy of which follows this page and is hereby incorporated as part of this Schedule 3.5.

ATLANTA:5126391.1

<u>Annex I (sample computation of Working Capital (eighty percent (80%) of the
Seller's Accounts Receivable and forty percent (40%) of Inventories)</u>

**Please see attached.**

ATLANTA:5126391.1

**Orco Construction Supply**

**Annex I to Asset Purchase Agreement, dated May 13, 2009**

**Between ORCO Construction Supply, Inc. and HD Supply Construction Supply, Ltd. (the "APA")**

The following is an example of the methodology to be used in the Working Capital calculation under Sections 1.7 of the APA.

The actual calculation will be as of the date of the Sale Order, as provided in those Section 1.7 of the APA.

**WORKING CAPITAL CALCULATION:**

| BALANCES AS OF: | | **04/07/09** |
|---|---|---|
| **ACCOUNTS RECEIVABLE** | | |
| Accounts Receivable | | 13,297,699 |
| Bad Debt Allowance | | (498,024) |
| ACCOUNTS RECEIVABLE, adjusted | | 12,799,675 |
| | | |
| Calculation  Rate | 80.00% | 80.00% |
| TOTAL NET ACCOUNTS RECEIVABLE | | 10,239,740 |
| | | |
| **INVENTORY** | | |
| Inventory | | 11,000,791 |
| Inventory Reserve | | (153,000) |
| INVENTORY, Adjusted | | 10,847,791 |
| | | |
| Calculation  Rate | 40.00% | 40.00% |
| TOTAL NET INVENTORY | | 4,339,116 |
| | | |
| **WORKING CAPITAL** | | **14,578,857** |

NOTES:

**A/R is presented net of the bad debt reserve. Bad debt is calculated at 0.3% of sales. The reserve percentage is based on ORCO's historical actual bad debt write-off, which has not changed materially in the period since ORCO's bankruptcy petition filed on April 7, 2009.**

**Inventory is presented net of established reserves. Inventory Reserve is based on 40% of slow-moving items (any sku not sold in 6 months).**

W03 051209-170190006/1562552/v4

ATLANTA:5126391.1